**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**



GENERAL COMPONENTS, INC.,

        **Plaintiff,**

    v.                                      **Civil Action No. 2:11cv152**

MICRON TECHNOLOGY, INC., et al.,

        **Defendants.**

## OPINION AND ORDER

This matter comes before the Court on remaining Defendants Mott Corp.'s ("Mott") and Setra Systems, Inc.'s ("Setra") (collectively, "Defendants") Motion to Declare this an Exceptional Case Pursuant to 35 U.S.C. § 285.[1] Doc. 79. After examination of the briefs and record, the Court determines that oral argument is unnecessary because the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Accordingly, for the reasons stated herein, the Court **DENIES** Defendants' Motion.

## I. BACKGROUND

### A. The Patent License Agreement between GCI and Fujikin

On July 8, 1994, Plaintiff General Components, Inc. ("GCI") and third party Fujikin, Inc. ("Fujikin") entered into a patent license agreement ("PLA") covering GCI's U.S. Patent No.

---

[1] Initially, Plaintiff also brought suit against Micron Technology, Inc., United Electric Controls Co., and Bronkhorst USA, Inc. Doc. 1. On May 25, 2011, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff filed a notice of voluntary dismissal, without prejudice of these defendants, and accordingly, they are no longer parties to this dispute.

5,505,464 ("'464 Patent"), entitled "Minimum Dead Volume Fitting." Doc. 80-2 (PLA). The PLA grants Fujikin the right to "make, have made, use and sell" all products licensed under the agreement. Doc. 80-2 at § 2.1. Licensed products are defined as "all fittings which are covered by claims in issued patents included among the Licensed Patents and sold by Licensee or any Licensee Affiliate, including without limitation the metal gaskets and other component parts comprising such fittings." Id. at § 1.2.

Further, the PLA provides that the Licensor "agrees not to assert any infringement or other claim or right under the Licensed Patents against any purchaser or user of a Licensed Product with respect to that purchaser's or user's installation or use of a Licensed Product. Doc. 80-2 at § 2.1. However, the PLA does provide procedures by which the parties may bring suit against any alleged third party infringers that are not considered "purchasers" or "users" of the licensed products. Id. at §§ 6.2-6.3. The PLA also requires that a party "promptly so notify the other party" if that party believes that a licensed patent is being infringed by a third party not covered by the PLA. Doc. 80-2 at § 6.1. The PLA specifically does "not include a right to grant sublicenses." Id. at § 2.1.

Finally, the PLA includes a "Binding Arbitration" clause, which provides that "[a]ny dispute with respect to the interpretation, application or enforcement of this Agreement shall be subject to binding arbitration pursuant to the 'International Arbitration Rules' of the American Arbitration Association then in effect . . . ." Id. at § 8.12.

**B. The Dispute between GCI and Fujikin**

In 1997, Fujikin filed a patent for its "W-seal" technology. Doc. 80-21 at 38 (Article by Frank Murch detailing the history of the W-seal). W-seal technology is primarily used by semiconductor equipment manufacturers to create a seal between components in gas delivery

systems found in their manufacturing equipment. Id. at 36-37. Fujikin initially licensed the W-seal to companies for a fee. Id. at 38. Thereafter, Fujikin began providing the W-seal technology to the semiconductor industry as a whole, without any fee, through an "Open Design Program." Id.; see also doc. 80-5 (2004 Article written by GCI's President & CEO) (noting that Fujikin has been licensing their W-seal to third parties under an "open architecture" policy).

GCI believed that Fujikin's W-seal technology was covered by the '464 patent, see e.g., doc. 80-5, and in 2001, GCI sued Fujikin in the United States District Court for the District of Maryland, General Components, Inc. v. Fujikin, Inc., No. DKC 2001-1790 ("District of Maryland case"), alleging patent infringement and improper sublicensing of the '464 patent by Fujikin. Doc. 80-6 at 2-3. In response, Fujikin moved to dismiss based on the "Binding Arbitration" clause in the PLA. Doc. 80-9 at 2.

On July 9, 2002, the court granted Fujikin's motion to dismiss. Doc. 80-9 at 5. First, the court noted that GCI's complaint alleged "that Fujikin is 'currently marketing, selling, licensing, and inducing others to sell and use . . . products that infringe one or more claims of [GCI's] '464 patent.'" Id. at 4-5. Based on this language, the court held that "[t]he licensing agreement undeniably governs the non-exclusive license granted to Fujikin by GCI for the '464 patent and the current dispute falls within its reach." Doc. 80-9 at 5. Thus, the court found that "Fujikin has shown all of the elements to require arbitration of this dispute," and the court granted Fujikin's motion to dismiss. Id.

On May 28, 2011, GCI submitted its claim against Fujikin to the American Arbitration Association for arbitration. Doc. 80-13. On August 16, 2011, GCI paid the arbitration proceed fee, allowing the arbitration to continue. Doc. 80-14.

## C. GCI'S Dispute with Mott and Setra

After the district court in Maryland dismissed its suit against Fujikin but before submitting its claim for arbitration, Raymond McGarvey, the President & CEO of GCI, submitted an article, which was published in the January/February 2004 issue of "Gases and Technology." Doc. 80-5. There, Mr. McGarvey summarized GCI's position for the industry with regard to third parties using Fujikin's W-seal technology. McGarvey stated that "[i]n our opinion, Fujikin's W-seal technology is clearly covered by our '464 patent." Id. at 36. McGarvey noted that GCI's suit against Fujikin had been "referred to arbitration," but stated that "any decision in the arbitration proceedings is only binding on the parties, GCI and Fujikin." Id. Thus, McGarvey concluded, "Accordingly, any product using this [W-seal] technology that is manufactured, assembled, sold, or used in the U.S. requires a license from GCI unless the W-seal hardware is purchased by or from Fujikin." Id.

Thereafter, GCI sent letters to Mott and another firm, Applied Materials, informing the firms that GCI believed that they were making, using, or selling W-seal design fittings and that this violated the '464 patent. Doc. 80-11 (May 26, 2010 Letter to Mott); Doc. 80-10 (December 22, 2008 Letter to Applied Materials). According to GCI, neither GCI nor its counsel ever received a response from Mott to this letter. Doc. 85-2 at ¶ 8 (Raymond McGarvey Decl.).

On March 10, 2011, GCI filed its Complaint in the instant action, alleging that five companies, including Mott and Setra, "infringed one or more claims of the '464 patent . . . through, among other activities, the manufacture, use, offer for sale, and/or sale of products and components that either wholly utilize and/or induce and contribute to the use of face sealing fittings that employ the inventions of the claims of the '464 patent." Doc. 1 at ¶ 13. The

4

Complaint further alleged that Defendants used, offered for sale, and/or sold W-seal products and/or components, and that these actions infringed the '464 patent. Id.

With respect to the source of GCI's belief that Mott and Setra infringed the '464 patent, GCI submitted a declaration by Mr. McGarvey, averring that his "understanding is that other companies in the United States manufacture and sell W-seal products that are not manufactured by or for Fujikin," doc. 85-2 at ¶ 5, and that, specifically, "Bar Manufacturing, LLC of El Dorado Hills, California manufactured and sold W-seal component base blocks to Mott and Setra that were not licensed under GCI's '464 patent." Id. at ¶ 6. Mr. McGarvey further declared that he had previously asked Fujikin for a list of companies that it alleged were licensed under the PLA, but that "Fujikin has never provided such a list." Id. at ¶ 9. Additionally, GCI noted that both Mott's and Setra's websites offer components for use in W-seal technology, but do not refer to Fujikin in any way. Doc. 85 at 10; see also doc. 85-5 (screenshots from Mott's website); doc. 85-6 (screenshots from Setra's website).

On April 1, 2011, GCI sent a letter to Fujikin, informing it that GCI had recently filed suit against "several U.S. infringers" of the '464 patent in the Eastern District of Virginia, based on GCI's belief that the '464 patent "cover[ed] Fujikin's 1.125" and 1.5" W-seal designs." Doc. 80-12 at 1. GCI also stated in its letter that it was "preparing to file arbitration against Fujikin as called for in the" PLA. Id. However, GCI sent no other notice to Fujikin that its patent was being infringed by unlicensed third parties. Doc. 86 at 13.

## D. The Parties' Actions during Litigation

On May 12, 2011, Mott and Setra answered GCI's Complaint and pleaded affirmative defenses and counterclaims. Doc 45; Doc. 46. Mott pleaded that it could not be sued by GCI under the PLA because it "purchased the accused products from Fujikin, Inc . . . . a licensed

party." Doc. 46 at 4, ¶ 18; see also id. at 8, ¶ 16. Similarly, Setra pleaded that it could not be liable for patent infringement because its W-seal products "were made by Setra for and on behalf of Fujikin, and are Licensed Products authorized for sale pursuant to the Patent License Agreement." Doc. 45 at 4-5, ¶¶ 21-22; see also id. at 11, ¶¶ 15-16. Both parties also asserted claims that GCI breached the PLA and the District of Maryland's previous order by filing suit, doc. 45 at 4-8, 10-12; doc. 46 at 4-5, 7-8, and that they believed this case was exceptional under 35 U.S.C. § 285. Doc. 45 at 11, ¶ 17; Doc. 46 at 8, ¶ 17.

On June 10, 2011, the Court entered a Rule 16(b) Scheduling Order requiring that discovery be completed in October and that expert discovery be completed by early November, 2011. Doc. 56. The Court also entered an Order on June 10, 2011, directing the parties to confer and submit a joint statement apprising the Court of the portions of the '464 patent actually in dispute by October 3, 2011. Doc. 57.

In order to explain its actions from June through August, GCI submitted declarations by two of its attorneys, Matthew G. McAndrews and Benje Selan, and various emails between GCI's and Defendants' counsel. Similarly, Defendants submitted a declaration by its former lead counsel, Andrew Hamill, and various correspondence.[2] During the Rule 26(f) conference on June 6, 2011, counsel for GCI suggested that the parties stipulate to dismissing this action without prejudice pending resolution of GCI's arbitration proceeding against Fujikin. Doc. 85-8 at ¶ 4 (McAndrews Decl.); Doc. 85-9 at ¶ 4 (Selan Decl.). In response, Defendants' counsel advised that they would have to consider GCI's proposal. Doc.85-8, at ¶ 5; Doc. 85-9 at ¶ 5.

Between the June 6 conference and June 19, 2011, counsel for GCI called Defendant's counsel and spoke regarding both GCI's proposal to dismiss the action without prejudice and

---

[2] For the most part, the parties' respective declarations do not specifically dispute the facts offered by the other party. As such, unless otherwise noted, the facts recited below have not been disputed.

Defendant's alleged customer and/or supplier relationships with Fujikin. Doc. 85-8 at ¶ 6. Counsel for all parties then spoke again on June 21, 2011. During that call, Defendants provided GCI with sales volume data for their accused products and discussed with GCI's counsel what percentage of both Mott's and Setra's accused products were alleged to be authorized under the PLA. Doc. 85-8 at ¶ 8-9; Doc. 80-19 at ¶ 12. Defendants' counsel also advised GCI's counsel that Defendants were still considering GCI's proposal to dismiss without prejudice. Doc. 85-8 at ¶ 11.

   A week later, on June 28, 2011, counsel for Defendants sent GCI's counsel an email advising them that Setra would not oppose being dismissed from the action without prejudice, but that "[s]ince Mott is in a different situation than Setra vis-à-vis the relationship with Fujikin, Mott would oppose a motion to dismiss without prejudice."[3] Doc. 85-11. Then, during the first or second week of July, GCI's counsel called lead counsel for Defendants, Mr. Hamill, and left a message, requesting a callback to discuss GCI's proposal. Doc. 85-8 at ¶ 12. Thereafter, GCI's counsel placed another call to Defendants' counsel before the end of July 2011. Id. at ¶ 13. During that call, a receptionist advised GCI's counsel that Mr. Hamill was no longer with Defendants' law firm. Id. On August 12, 2011, GCI's counsel emailed two other partners at Defendants' law firm concerning Setra's dismissal from the action. Doc. 85-12. Later that day, counsel for the parties conferred by telephone and Defendants' counsel advised GCI's counsel that, at that time, neither Defendant would agree to dismissal without prejudice and that both Defendants intended to proceed with the litigation. Doc. 85-8 at ¶ 14.

   Still later on August 12, 2011, and in keeping with their intent to proceed, Defendants emailed their initial expert disclosures and discovery requests to GCI's counsel, and also

---

[3] Defendants assert that the "different situation" referred to in the June 28 email was "that Setra sells accused products directly to Fujikin, whereas Mott does not sell accused products directly to Fujikin. Doc. 80-19 at ¶ 11.

requested that the parties agree on a schedule for completing the joint claim construction statement due by October 3, 2011. Doc. 85-13. Defendants' counsel then sent multiple letters and emails to GCI's counsel regarding the claim construction process between August 15 and August 22, 2011. Docs. 80-16; 80-17; 80-18. GCI's counsel did not respond to any of these letters or emails. See doc. 80-18.

However, on August 23, 2011, GCI filed a motion to stay pending resolution of GCI's arbitration proceedings against Fujikin, or in the alternative, to dismiss without prejudice ("Motion to Stay"). Doc. 67. This motion was filed over a month before the parties' October 3, 2011 deadline for submission of their joint claim construction statement.

The next day, August 24, GCI's counsel spoke to Defendants' counsel about the possibility of staying or dismissing the action. Doc. 85-8 at ¶ 15. According to GCI, during the discussion, GCI's counsel "reiterated GCI's longtime, good faith belief that Setra and Mott had sold and continue to sell non-Fujikin-related W-seal components." Id. at ¶ 16. Defendants' counsel then advised GCI's counsel that Defendants would only be willing to dismiss the action if it were with prejudice as to each of the Defendants. Id. at ¶ 17. According to GCI, "GCI determined that the sales volume of Defendants' accused products (based on counsels' discussions), and lack of clarity concerning what, if any, percentage of Defendants' products are supplied by or to Fujikin, might warrant dismissal of the action." Doc. 85 at 17.

The parties spoke again on August 26, 2011, and then, on August 30, 2011, they agreed to terminate the case by filing a covenant not to sue Mott and Setra. Doc. 85-17 (Defendants' counsel's August 31, 2011 email memorializing parties' August 30, 2011 discussions). GCI filed its Motion to Dismiss for Lack of Jurisdiction, doc. 69, and accompanying Covenant not to

Sue Setra and Mott on September 1, 2011. Doc. 70-1. On October 28, 2011, the Court dismissed GCI's claims with prejudice. Doc. 78.

With respect to GCI's discovery obligations throughout this period, GCI filed its expert witness and Rule 26(a)(2)(B) disclosures, as required by the 16(b) Order on August 12, 2011. Doc. 86 at 5; Doc. 80-27. However, Plaintiff did not file any additional discovery documents or take part in the joint claim construction process. In essence, GCI appears to have stopped litigating the case on its merits after filing its Motion to Stay on August 23, 2011.

**E. The Instant Motion**

Defendants filed their Motion to Declare this an Exceptional Case pursuant to 35 U.S.C. § 285 and accompanying memorandum on November 11, 2011. Docs. 79, 80, 86 (Corrected Memorandum). GCI filed its Opposition on December 2, 2011. Doc. 85. Defendants filed their Reply on December 9, 2011. Doc. 87. Accordingly, this Motion is now ready for the Court's review.

## II. DISCUSSION

Under 35 U.S.C. § 285, a 'court in exceptional cases may award reasonable attorney[s'] fees to the prevailing party.'[4] iLOR, LLC. v. Google, Inc., 631 F.3d 1372, 1376 (Fed. Cir. 2011) (internal citations omitted) (alteration in original).[5] "[A]n award of attorneys' fees is permissible 'when there has been some material inappropriate conduct related to the matter in

---

[4] The parties do not, nor could they, dispute that by filing a covenant not to sue and moving to dismiss this case with prejudice, Defendants have become the prevailing parties and may bring this motion under 35 U.S.C. § 285. See Highway Equip. v. FECO, 469 F.3d 1027, 1035-36 (Fed. Cir. 2006).

[5] In determining whether a case is exceptional, and, thus, eligible for an award of attorney fees under § 285, the Court must engage in "a two-step process." Wedgetail, Ltd. v. Huddleston Deluxe, Inc., 576 F.3d 1302, 1304 (Fed. Cir. 2009). "First, the district court must determine whether a case is exceptional, a factual determination reviewed for clear error. After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate, a determination that [is] review[ed] for an abuse of discretion." Id. Here, as the Court finds that this case is not exceptional under Section 285, the Court need not reach the second step in the analysis. C.f. Thomas & Betts Power Solutions, L.L.C. v. Power Distribution, Inc., No. 3:07cv167, 2008 WL 779528 at *1 (E.D. Va. March 21, 2008) (only allowing further briefing to determine whether an award of attorneys' fees was appropriate after, first, determining that the case was exceptional).

litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions.'" Id. at 1376-77 (quoting Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005)).

However, "[i]t is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits." Forest Laboratories, Inc. v. Abbott Laboratories, 339 F.3d 1324, 1329 (Fed. Cir. 2003) (quoting Rohm & Haas Co. v. Crystal Chem. Co., 736 F.2d 688, 690-91 (Fed. Cir. 1984)) (internal quotations omitted). Indeed, the Federal Circuit has observed that "§ 285 is limited to circumstances in which it is necessary to prevent 'a gross injustice' to the accused infringer." Id. (internal citations omitted). Accordingly, "absent misconduct during patent prosecution or litigation, sanctions may be imposed against a patent plaintiff 'only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'" iLOR, 631 F.3d at 1377 (emphasis added). Here, Defendants argue that this case is exceptional both because GCI engaged in litigation misconduct and because it brought an objectively baseless litigation in subjective bad faith. The Court will address each of these arguments in turn.

## A. Litigation Misconduct

"Litigation misconduct generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings." Old Reliable, 635 F.3d at 549 (internal citations omitted). However, it does not ordinarily include conduct that occurred prior to the commencement of litigation. See Forest Laboratories, 339 F.3d at 1329 (holding that "a patentee's bad-faith business conduct toward an accused infringer prior to litigation," although leading to a finding of equitable estoppel, could not make a case exceptional under Section 285).

10

Additionally, otherwise valid actions accompanied by "open speculation" as to their purpose cannot rise to the level of litigation misconduct. See Stephens v. Tech International, Inc., 393 F.3d 1269, 1276 (Fed. Cir. 2004) (holding that the potentially suspicious timing of otherwise valid litigation actions, without more, did not provide the clear and convincing evidence required for a finding of litigation misconduct).

Moreover, the "purpose of section 285 'is to provide discretion where it would be grossly unjust that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear.'" Badalamenti v. Dunham's, Inc., 896 F.2d 1359, 1364 (Fed. Cir. 1990) (quoting J.P. Stevens Co. v. Lex Tex Ltd., 822 F.2d 1047, 1052 (Fed. Cir. 1987)) (emphasis in original). As such, "[t]o award attorneys' fees, the Court must find that Defendants have demonstrated by clear and convincing evidence that [the plaintiff's] litigation conduct was so egregious that attorneys' fees are warranted." DNT, LLC v. Sprint Spectrum, LP, 750 F. Supp. 2d 616, 621 (E.D. Va. 2010).

Here, GCI's conduct during the litigation did not to rise to a level "so egregious that attorneys' fees are warranted." Indeed, GCI began discussing the possibility of dismissing this case without prejudice at the very first formal meeting called by the Court, the Rule 26(f) conference on June 6, 2011. Doc. 85-8 at ¶ 4; Doc. 85-9 at ¶ 4. GCI then continued those discussions between June 6 and June 21, 2011, offering to dismiss the action without prejudice so that GCI's arbitration proceeding against Fujikin might be resolved. Doc. 85-8 at ¶¶ 4-6. On June 21, 2011, the parties spoke again, discussing both GCI's proposal and what, if any, portion of Defendants' accused products were authorized under the PLA. Id. at ¶¶ 8-9; Doc. 87 at 11. And, on June 28, 2011, counsel for Defendants sent GCI an email advising it that Setra, but not Mott, would not oppose being dismissed from the action without prejudice. Doc. 85-11. As

such, GCI began having meaningful discussions regarding this action's dismissal within a month of being informed by Defendants' pleadings that Defendants might be tied to Fujikin in such a way as to preclude their suit. GCI's conduct demonstrates a desire to fairly and faithfully pursue its claims under the applicable law in the applicable forum, not to "misuse[ ] Mott and Setra as pawns," as Defendants claim. See doc. 86 at 14.

Further, after engaging in discussions with Defendants, GCI continued to work faithfully to dismiss or stay the case pending arbitration, first by filing its Motion to Stay on August 23, 2011, doc. 67, and then by agreeing to file a Covenant not to Sue and to dismiss with prejudice on September 1, 2011. Doc. 69. In truth, GCI could have forced Defendants to expend substantial resources engaging in claim construction, discovery, and perhaps even summary judgment or trial, but instead agreed to dismiss its claims with prejudice before any of this occurred. GCI's behavior is entirely consistent with that of a patentee who believed, at the time it filed suit, that it had the right to bring its claims in federal court, but then subsequently learned, based on a review of the opposing party's pleadings and discussions with counsel, that its claims likely should have been arbitrated. Its behavior falls far short of that ordinarily found to be clear and convincing evidence of litigation misconduct. See, e.g., Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1325 (Fed. Cir. 2011) (affirming district court's litigation misconduct holding based on district court's finding that plaintiff "failed to engage the claim construction process in good faith" and displayed a "lack of regard for the judicial system," by failing to offer a construction for any disputed claim terms, lodging incomplete and misleading extrinsic evidence with the court, and submitting declarations that contradicted earlier deposition testimony by the declarants); ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1380 (Fed. Cir. 2009) (affirming an award of attorney fees where a party made "multiple, repeated misrepresentations"

to the court) (internal citations and quotations omitted); <u>Mathis v. Spears</u>, 857 F.2d 749, 752 (Fed. Cir. 1988) (affirming an award of attorney fees where a party "blatantly misled [ ] the PTO" and then "attempted to employ the courts as handmaidens to its iniquity") (footnote omitted).

Defendants point to the lack of written correspondence from GCI between June 28, 2011 and August 12, 2011 to argue that "it is now evident that GCI had no intention of truly litigating this case," and that "Mott and Setra were forced to needlessly defend themselves for more than three months" before the case was dismissed. Doc. 86 at 15.[6] But, such an argument unfairly construes the evidence against GCI. GCI argues that it twice tried to contact Defendants' lead counsel, Mr. Hamill, during GCI's alleged period of inactivity, but was unsuccessful, as GCI's counsel later discovered that Mr. Hamill had left Defendants' law firm. Doc. 85-8 at ¶¶ 12-13. In response, Defendants do not dispute that GCI's counsel made the calls in question, but instead only note the alternative actions that GCI's counsel might have taken upon learning that Mr. Hamill was no longer with the firm. <u>See</u> doc. 87 at 12. Thus, GCI continued to attempt to contact Defendants throughout the time period at issue.[7]

---

[6] Defendants also argue that GCI knew that Mott and Setra's W-seal products were "associated with Fujikin" when it filed suit and answered Defendants' counterclaims, but nevertheless continued to press its claims. Doc. 86 at 15. Although it is true that a court may find litigation misconduct where a plaintiff "not only initiated a frivolous lawsuit, [but also] it persisted in advancing unfounded arguments that unnecessarily extended this litigation and caused [the defendant] to incur needless litigation expenses," <u>Marctec, LLC v. Johnson & Johnson</u>, 664 F.3d 907, 920-21 (Fed. Cir. 2012), as described below, GCI's lawsuit here was not frivolous. Further, GCI did not advance any unfounded arguments, as it agreed to a dismissal of this action before claim construction or any other dispositive motion was filed. As such, Defendants' argument is without merit.

[7] Even assuming that GCI had not attempted to contact Defendants' counsel between June 28, 2011 and August 12, 2011, this, approximately, six weeks of inaction, is not such a prolonged period as to demonstrate by clear and convincing evidence that GCI had engaged in the type of misconduct that would make it "grossly unjust" for Mott and Setra to pay their own fees. <u>Badalamenti</u>, 896 F.2d 1364. <u>C.f.</u> <u>Thomas & Betts</u>, 2008 WL 373639 at *2 (holding that the plaintiff's "continued pursuit of baseless claims that had no chance of success" after claim construction, needlessly prolonging the litigation for an additional five months, presented clear and convincing evidence that the case was exceptional).

Moreover, to the extent that Defendants complain about the, approximately, two week period of inactivity by GCI after GCI learned that Mr. Hamill had left Defendants' law firm, it would have been perfectly reasonable for GCI's counsel to wait a few weeks before contacting Defendants' counsel again, so as to ensure that Defendants had a new contact in place to handle the call. This is especially true given that Defendants allowed their lead counsel to leave without taking any steps to inform GCI of the change and, apparently, without providing GCI with any other point of contact. Consequently, Defendants have not met their burden of establishing by clear and convincing evidence that GCI engaged in litigation misconduct.

Likewise, with respect to GCI's alleged failure to file discovery requests and to engage in claim construction, Defendants ignore the fact that none of these deadlines had passed when GCI filed its Motion to Dismiss for Lack of Jurisdiction and accompanying Covenant not to Sue on September 1, 2011. See doc. 56 (Rule 16(b) Order setting deadlines for Rule 26(a)(2)(B) disclosures for September 12, 2011 and deadlines for discovery in October, 2011); doc. 57 (Order requiring parties to confer and submit joint claim construction by October 3, 2011). Due to briefing and the Court's consideration of GCI's motion, this case was not dismissed until October 28, 2011, doc. 78, and GCI technically should have complied with the Court's scheduling and claim construction orders during that time. But this technical violation actually saved the parties the expense of litigating what would soon become unnecessary issues, especially considering that Defendants did not oppose GCI's Motion to Dismiss with prejudice. Therefore, this violation did not rise to the level of a "gross injustice" that would warrant a grant of attorneys' fees. See Medtronic Navigation, Inc. v. Brainlab Medizinische Computer-Systeme GMBH, 603 F.3d 943, 965 (Fed. Cir. 2010) (holding that a single incident of improper conduct

was "not sufficient to support the district court's finding that this case is 'exceptional,' when viewed in context).

Indeed, despite Defendants' protestations to the contrary, any prolonging of this action appears to be based on either a lack of communication between the parties or Defendants' own inaction, not on any litigation misconduct by GCI. Defendants argue that between June 28, 2011 and September 1, 2011, they were "busy hiring and working with experts, developing claim construction, invalidity, and non-infringement positions, serving discovery, and preparing for expert reports due on September 12, 2011." Doc. 87 at 10. Yet, it was Defendants, and not GCI, who failed to move to dismiss in favor of arbitration at the beginning of this case. Such a motion could have avoided all of the additional expense of which Defendants now complain. See Ruben v. Warren City Sch., 825 F.2d 977, 988 (6th Cir. 1987) (cited favorably by Medtronic, 603 F.3d at 954) ("A sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants.").[8]

Further, as described above, while Defendants were working on their substantive defenses, GCI was working to dismiss or stay this action, first without prejudice, and then later, at Defendants' insistence, with prejudice. If Defendants had any doubt as to GCI's intentions, all they had to do was pick up the phone and call. Thus, whatever expenditure of resources by Defendants occurred was not caused by GCI's actions, but instead by a simple failure to communicate between the parties. And this failure was magnified by the apparent confusion that

---

[8] In their Reply, Defendants argue that they were precluded from making such a motion by GCI's denials of Defendant's counterclaims, doc. 87 at 13, but where jurisdictional facts are disputed, a court "may . . . go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." Williams v. Jeep Sales & Service Co., 161 F.3d 5 (4th Cir. 1998) (unpublished) (per curiam) (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). Moreover, this does not explain why Defendants did not make such a motion at the outset, before even answering GCI's complaint.

resulted from the departure of Defendants' lead counsel, Mr. Hamill.[9] The Court does not

suggest that this lack of communication was the fault of either party, but based on the

circumstances of this case, it did not make it "grossly unjust" that the winner be left to bear the

burden of his own counsel which prevailing litigants normally bear.'" Badalamenti, 896 F.2d at

1364. Accordingly, the Court **FINDS** that no litigation misconduct took place in this case.

## B. Objective Baselessness and Subjective Bad Faith

As the Court finds that no litigation misconduct took place in this case, sanctions may be

imposed against GCI only if both (1) the litigation was brought in subjective bad faith, and (2)

the litigation was objectively baseless. iLOR, 631 F.3d at 1377. Indeed, "[a]n infringement

action 'does not become unreasonable in terms of [§ 285] if the infringement can reasonably be

disputed. Infringement is often difficult to determine, and a patentee's ultimately incorrect view

of how a court will find does not of itself establish bad faith.'" Id. (quoting Brooks Furniture,

393 F.3d at 1384). Thus, "[u]nder this exacting standard, the plaintiff's case must have no

objective foundation, and the plaintiff must actually know this," and both prongs of this test

"must be established by clear and convincing evidence." Id. (internal citations omitted).

Additionally, "[o]nly if challenged litigation is objectively meritless may a court examine

the litigant's subjective motivation." Id. at 1376; see also Old Reliable Wholesale, Inc. v.

Cornell Corp., 635 F.3d 539, 547 n. 4 (Fed. Cir. 2011) ("When making a section 285 fee award,

subjective considerations of bad faith are irrelevant if the challenged claims or defenses are not

objectively baseless."). As such, the Court will begin with an analysis of objective baselessness

and then turn to subjective bad faith.

---

[9] Additionally, Defendants did not serve their discovery requests and initial disclosures or begin discussing the claim construction process with GCI until August 12, 2011, the same day that GCI again contacted Defendants to discuss the possibility of dismissing the case. That this service occurred less than two weeks before GCI filed its Motion to Stay further highlights the fact that Defendants' litigation expenses could have been avoided by effective communication between the parties.

### *1. Objective Baselessness*

"To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." iLOR, 631 F.3d at 1378 (quoting Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008)); see also Old Reliable, 635 F.3d at 546 (holding that plaintiff's claims were not objectively meritless because there was nothing "frivolous or inherently implausible" about its assertions). Further, "[o]bjective baselessness 'does not depend on the plaintiff's state of mind at the time the action was commenced, but rather requires an objective assessment of the merits.'" iLOR, 631 F.3d at 1377 (quoting Brooks Furniture, 393 F.3d at 1382). Consequently, "state of mind is irrelevant to the objective baseless inquiry." Id. at 1377-78 (internal citations omitted). Instead, "[t]he existence of objective baselessness is to be determined based on the record ultimately made in the infringement proceedings." Id. at 1378 (citing Brooks Furniture, 393 F.3d at 1382; In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc)).

Moreover, the Federal Circuit has made it clear that a plaintiff must have been actually foreclosed or precluded from making his allegations in order for the Court to find that "no reasonable litigant could reasonably expect success on the merits." See iLOR, 631 F.3d at 1378-79. In iLOR, the court found that the plaintiff's proposed claim construction was not objectively baseless under Section 285, even though the court agreed that it was incorrect. Id. at 1374. First, the court found that "[a] reasonable litigant could proffer [his] arguments in good faith," because, even though the claim language at issue did not support the plaintiff's proposed construction, "[o]n its face, the claim language [did] not preclude the patentee's construction" either. Id. at 1378. Second, the court concluded that the specification at issue did not "clearly refute the patentee's construction," because although "the specification does not disclose a right-click

embodiment, it does not foreclose the argument either." Id. at 1378-79. Finally, the court

determined that any reliance on the prosecution history of the parent patent was misplaced,

because even though the court eventually found that a disclaimer in the prosecution history did

apply to the claim at issue, the plaintiff could have reasonably argued that the disclaimer only

applied to other claims, not at issue, due to differences in the language of the claims. Id. at 1379.

For all of these reasons, the court held that "[the plaintiff] could reasonably argue for the claim

construction that it proposed." Id.

Moreover, the court recognized that in order to find the plaintiff's proposed claim

construction objectively baseless, the proposed claim construction had to be "so unreasonable

that no reasonable litigant could believe it would succeed." Id. at 1378. Indeed, the court

reiterated that "it is not for us to determine whether [plaintiff's] pre-filing interpretation of the

asserted claims was correct, but only whether it was frivolous." Id. at 1379 (alteration in

original). Thus, the court concluded that "simply being wrong about claim construction should

not subject a party to sanctions where the construction is not objectively baseless," id. at 1380,

and in its case, "[t]he objective evidence . . . demonstrates that [the plaintiff] could reasonably

argue that its broad claim construction position was correct and that [the defendant] infringed its

claims." Id. at 1379.

In this case, Defendants argue that GCI's claims were objectively baseless because GCI

was forbidden from bringing them in federal court. See doc. 86 at 8-9. As such, in order to find

that GCI's claims were objectively baseless, they must have been such that "no reasonable

litigant could reasonably expect" them to have been brought permissibly in federal court. See

iLOR, 631 F.3d at 1378. In other words, Defendants must demonstrate by clear and convincing

evidence that all reasonable litigants would have known that GCI was actually foreclosed or

precluded from bringing its claims in federal court. See id. at 1378-79. Accordingly, as neither the PLA nor any previous precedent actually foreclosed GCI from bringing its claims in federal court, GCI's claims were not objectively baseless when filed.

First, the PLA did not clearly require GCI to arbitrate its claims, so that "no reasonable litigant could reasonably expect" them to have been brought permissibly in federal court. See iLOR, 631 F.3d at 1378. The PLA's "Binding Arbitration" clause provides that "[a]ny dispute with respect to the interpretation, application or enforcement of this Agreement shall be subject to binding arbitration pursuant to the 'International Arbitration Rules' of the American Arbitration Association ["AAA"] then in effect . . . ." Doc. 80-2 at § 8.12. Although this arbitration clause is a "broad one," see AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986), it does not specifically refer the arbitrability decision to arbitration. See Peabody Holding Co., LLC v. United Mine Workers of America, Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012) ("Parties, to be sure, can agree to arbitrate arbitrability, but such agreement 'must … clearly and unmistakably provide that the arbitrator shall determine what disputes the parties agreed to arbitrate.'") (quoting Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999)). Indeed, the PLA does not refer to the issue of arbitrability at all. See Doc. 80-2 at §§ 8.12 – 8.12.6. As such, the expansive language of the arbitration clause, without more, is insufficient to find a clear and unmistakable intent to arbitrate the issue of arbitrability. Peabody, 665 F.3d at 102 ("The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more will not suffice.") (internal citations omitted).

Further, although the arbitration clause incorporates AAA rules that specifically grant the authority to decide the issue of arbitrability to an arbitrator, such incorporation did not foreclose GCI from arguing that "clear and unmistakable evidence" of the parties' intent to arbitrate the

issue of arbitrability did not exist, given the current state of Fourth Circuit precedent.[10] See

Peabody, 665 F.3d at 102 ("Those who wish to let an arbitrator decide which issues are arbitrable

need only state that all disputes concerning the arbitrability of particular disputes under this

contract are hereby committed to arbitration, or words to that effect.") (quoting Carson, 175 F.3d

at 330-31). Accordingly, as GCI had the right to have the Court determine what claims, if any,

should be arbitrated, the PLA's arbitration clause did not make GCI's claims objectively baseless

when filed.

Second, Judge Chasanow's order in the District of Maryland case did not make GCI's

claims objectively baseless when filed. In that case, the court did not have Mott or Setra before

it, nor did it address the scope of the PLA's arbitration provision, with respect to third parties.

The court did not determine when GCI may sue third parties or when it must arbitrate its claims

against them. The court did not even determine that all disputes between the signatories of the

PLA must be arbitrated. Instead, it held only that a specific dispute between Fujikin and GCI

regarding a specific issue, the alleged sublicensing of the PLA by Fujikin, must be arbitrated;

nothing more. See id. As such, the court's order did not restrict, in any way, GCI's ability to

---

[10] Currently, the Fourth Circuit has not ruled, and district courts in the Fourth Circuit are divided, on whether the incorporation into arbitration agreements of arbitral rules that grant authority to decide arbitrability to arbitrators, such as the AAA "International Arbitration Rules," that were incorporated here, see PLA at § 8.12, provide clear and unmistakable evidence of the parties' intention to submit the question of arbitrability to arbitration. See Sher v. Goldman Sachs, No. CCB-11-2796, 2012 WL 1377066 at *5 (D. Md. Apr. 19, 2012) (comparing Sys. Research & Applications Corp. v. Rohde & Schwarz Fed. Sys. Inc., 2012 WL 1275 at *5 (E.D. Va. Jan. 4, 2012) (endorsing "the rule adopted by a majority of federal courts . . . that the incorporation of AAA rules into a contract clearly and unmistakably vests the arbitrator, and not the district court, with authority to decide which issues are subject to arbitration") with Diesselhorst v. Munsey Bldg., L.L.L.P., 2005 WL 327532 at *4 (D. Md. Feb. 9, 2005) ("That the parties agreed to arbitrate in accordance with the AAA Rules, which provide that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction' . . . does not confer authority on the arbitrator to decide which claims are arbitrable.")). Based on this conflict in authority, GCI was not foreclosed from bringing its claims in federal court so that the Court might decide whether it had the authority to decide the issue of arbitrability. As such, the incorporation of the AAA rules into the PLA did not make GCI's claims in federal court objectively baseless. See iLOR, 631 F.3d at 1378-79. Cf. Phonometrics, Inc. v. Westin Hotel Co., 350 F.3d 1242, 1247 (Fed. Cir. 2003).

bring this suit in federal court.[11] This suit is not "GCI's shameless play for a 'do over,'" as Defendants allege. See doc. 87 at 2. Instead, GCI had the right to have this Court determine the scope of the PLA's arbitration provision with respect to a different dispute between different parties, and nothing in Judge Chasanow's order clearly requires any other conclusion. See iLOR, 631 F.3d at 1378-79.

Third, no other provisions in the PLA foreclosed GCI from bringing this suit against Defendants in federal court. The PLA does not preclude GCI from filing patent infringement claims against all those companies with products "tied to" Fujikin's W-seal technology as Defendants claim, see doc. 86 at 9, but instead only requires that GCI not sue those companies that either supply licensed products to Fujikin, or are supplied licensed products by Fujikin. See doc. 80-2 at § 2.3 (requiring that GCI "not [ ] assert any infringement or other claim or right under the Licensed Patents against any purchaser or user of a Licensed Product with respect to that purchaser's or user's installation or use of a Licensed Product") (emphasis added); see also id. at § 1.2 (defining Licensed products as "all fittings which are covered by claims in issued patents included among the Licensed Patents and sold by Licensee or any Licensee Affiliate, including without limitation the metal gaskets and other component parts comprising such fittings") (emphasis added); id. at § 2.1 (noting that the PLA grants Fujikin the right to "make, have made, use and sell" all products licensed under the agreement) (emphasis added).[12]

---

[11] As the court in the District of Maryland case did not order that all disputes between GCI and third parties under the PLA must be arbitrated, regardless of their scope, the cases cited by Defendants for the proposition that a case should be declared exceptional when a patentee attempts to relitigate an issue that has already been decided are inapposite. See doc. 87 at 6.

[12] The parties also appear to agree on this construction of the anti-suit language in the PLA. See Doc. 86 at 2 ("The PLA also grants third party suppliers the right to make such fittings and components for Fujikin, and thereby prohibits GCI from suing such suppliers."); Doc. 85 at 2 ("GCI premised its patent infringement claims . . . on the good faith belief and understanding that each defendant has manufactured, used, sold, and/or offered for sale products that infringe GCI's '464 patent-in-suit where such products are *not* supplied to or by third-party, Fujikin, Inc.") (emphasis in original).

Indeed, the PLA provides procedures by which the parties may bring suit against any alleged third party infringers of a licensed product. See id. at §§ 6.2-6.3. Moreover, the PLA goes so far as to give GCI, as the licensor, "the first right, but not the obligation" to bring suit against any unlicensed third party that GCI believes is infringing any of the "Licensed Patents." Id. at §§ 6.1-6.2. Thus, if Defendants neither supplied licensed products to Fujikin, nor were supplied licensed products by Fujikin, then any suit of Defendants for infringing the '464 patent would be specifically authorized under the PLA.

And here, the objective evidence available to GCI at the time of this suit did not foreclose GCI from arguing that Mott and Setra neither supplied licensed products to Fujikin, nor were supplied licensed products by Fujikin, but were still infringing the '464 patent. At the time GCI filed its claims, Fujikin had been providing its W-seal technology to the semiconductor industry as a whole, without any fee, for years through an "Open Design Program." Doc. 80-21 at 38; see also doc. 80-5 (2004 Article written by GCI's President & CEO) (noting that Fujikin has been licensing their W-seal to third parties under an "open architecture" policy). Therefore, other companies could have used that technology to produce W-seal components that were neither manufactured by Fujikin, nor sold to Fujikin.

Further, Defendants have not offered any evidence that proves that a reasonable member of the semiconductor industry would have known that Mott and Setra either manufactured their W-seal products for Fujikin or purchased their W-seal products from Fujikin. C.f. doc. 85-5 (screenshots from Mott's website offering components in W-seal configurations without referring to Fujikin in any way); doc. 85-6 (screenshots from Setra's website offering components with a "W-seal down-mount pressure port" without referring to Fujikin in any

way).[13]  Accordingly, at the time it filed suit, GCI was not foreclosed from arguing that Mott and

Setra infringed the '464 patent by manufacturing or selling W-seal products that were not made

for or purchased from Fujikin, and therefore, the anti-suit language in the PLA did not make

GCI's claims objectively baseless when filed. See iLOR, 631 F.3d at 1378-79.[14]

Fourth, GCI was not foreclosed from arguing that Mott and Setra had no right to enforce

the PLA against GCI, and thus, had no right to use its provisions to keep GCI from federal court.

Mott and Setra were not signatories to the PLA, nor were they specifically mentioned in the PLA

or in any addendum to the PLA.  It is true that Defendants, as third parties to the agreement,

might still have had a right to enforce the PLA's provisions under either a theory of equitable

estoppel or as third party beneficiaries.  But, given that GCI was not foreclosed from arguing that

Mott and Setra neither manufactured W-seal products for, nor purchased W-seal products from,

Fujikin, GCI was not foreclosed from arguing that neither of these theories applied to Defendants

either. See Brantley v. Republic Mortgage Insurance Co., 424 F.3d 392, 395-96 (4th Cir. 2005)

---

[13] Defendants use the following evidence to argue that "it would be unreasonable for any objective observer to have a good faith basis to believe that the Defendants' W-seal products were not associated with Fujikin's W-seal technology:" (1) that GCI sent Fujikin a letter stating that it had sued a number of companies based on their use of Fujikin's W-seal designs, (2) that GCI sent a claim chart to Mott comparing the claims of the '464 patent to Fujikin's W-seal patents, (3) that publicly available evidence exists indicating that the term "W-seal" is synonymous with Fujikin's W-seal technology, and (4) that GCI's "knowledge and involvement in the industry" would have made them aware of this evidence." Doc. 86 at 10-12. However, this argument ignores the fact that, as described above, Fujikin has offered its W-seal technology to the entire semiconductor industry through a free licensing program, potentially allowing any member of that industry to produce W-seal technology that is neither made by or for Fujikin. As such, none of Defendants' purported "smoking guns," see doc. 86 at 11, actually foreclosed GCI from arguing that Mott and Setra produced W-seal technology that was neither manufactured for, nor purchased from, Fujikin. Additionally, to the extent that this evidence goes to GCI's subjective knowledge at the time it brought suit, it is irrelevant to a determination of objective baselessness. iLor, 631 F.3d at 1380.

[14] Defendants also argue that "the undisputed record shows that all W-seal manufacturers 'deal with Fujikin' because Fujikin is the only company that sells W-seal gaskets, a component that is necessary to form a W-seal fitting." Doc. 87 at 8. However, this argument misstates the evidence. Defendants did not present any evidence that proved that Fujikin is the only company that sells W-seal gaskets. Instead, Defendants only presented two declarations from two upper-echelon employees at Mott and Setra, where both employees swore that they were "not aware of any company other than Fujikin, Inc. that sells W-seal gaskets." Doc 80-3; Doc. 80-4. These declarations did not foreclose GCI from reasonably arguing that Mott and Setra both did not purchase any W-seal products from Fujikin and did not manufacture any W-seal products for Fujikin at the time GCI filed suit, even if GCI was ultimately proven incorrect in the matter. And that is what Defendants must show by clear and convincing evidence in order to have the Court declare this case exceptional. See iLOR, 631 F.3d at 1378-79.

(noting that equitable estoppel only applies when either (1) a signatory "'rel[ies]' on the terms of the written agreement in asserting [its] claims' against the nonsignatory" or (2) "when the signatory . . . raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract") (internal citations omitted); R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 164 (4th Cir. 2004) (noting that a third party is only a third party beneficiary to a contract when the "contracting parties intended to create a direct, rather than an incidental or consequential, benefit to [a] third person."). As such, this constitutes another independent reason why GCI's claims were not objectively baseless when filed. See iLOR, 631 F.3d at 1378-79.

In sum, GCI's claims were not objectively baseless when filed, as neither the PLA nor any previous precedent actually foreclosed GCI from bringing its claims in federal court. GCI reasonably could have believed that it was entitled to bring its claims in order to have the Court determine either the scope of the issues to be arbitrated, or whether Mott and Setra, as third parties, had the authority to enforce the PLA's provisions. And despite Defendants' arguments to the contrary, neither Judge Chasanow's order, the provisions of the PLA, nor the objective evidence known to GCI at the time it filed its complaint alters this conclusion. Accordingly, the Court **FINDS** that GCI's claims were not objectively baseless when filed.

### 2. Subjective Bad Faith

As the Court finds that GCI's claims were not objectively baseless when filed, the Court need not consider GCI's subjective motivations in bringing suit. iLOR, 631 F.3d at 1376 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). However, even if the Court was to find that GCI's claims were objectively

baseless when filed, the Court still would not find that GCI's claims were brought in subjective bad faith.

A litigation is brought in subjective bad faith when the plaintiff knows that its allegations are baseless, but pursues them anyway. See Marctec, LLC v. Johnson & Johnson, 664 F.3d 907, 917 (Fed. Cir. 2012) (holding that subjective bad faith existed because "the district court made several findings supporting its conclusion that [the plaintiff] knew its allegations were baseless but pursued them anyway"). Additionally, where "the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence.'" Phonometrics, Inc. v. Westin Hotel Co., 350 F.3d 1242, 1246 (Fed. Cir. 2003) (quoting Eltech Systems Corp. v. PPG Industries, Inc., 903 F.2d 805, 811 (Fed. Cir. 1990)); see also Marctec, 664 F.3d at 919 ("MarcTec's proposed claim construction was so lacking in any evidentiary support that assertion of this construction was unreasonable and reflects a lack of good faith. And, MarcTec's decision to continue this litigation after claim construction further supports the district court's finding that this is an exceptional case."). Indeed, "[a] party confronted with the difficulty of proving what is in an adversary's mind must be at liberty to prove facts establishing that the adversary should have known, i.e. to prove facts that render the "I didn't know" excuse unacceptable." Eltech, 903 F.2d at 810.

Here, as described above, Fujikin has offered its W-seal technology to the entire semiconductor industry through a free licensing program, potentially allowing any member of that industry to produce W-seal components that are neither made by or for Fujikin. Thus, the most that Defendants' evidence demonstrates is that GCI knew that Mott and Setra were

manufacturing W-seal components.[15] Critically, Defendants' evidence does not demonstrate that GCI knew, at the time it filed suit, either that Mott and Setra were manufacturing W-seal components for Fujikin or that Defendants' W-seal components were manufactured by Fujikin. And without such proof, Defendants cannot demonstrate by clear and convincing evidence that GCI filed its claims in subjective bad faith. See Marctec, 664 F.3d at 917.[16]

Further, to the extent that the evidence suggests anything about GCI's subjective belief at the time it filed suit, it suggests that GCI actually believed that Defendants possessed W-seal components that were neither manufactured for, nor purchased from, Fujikin. Indeed, Mr. McGarvey's (the President & CEO of GCI) 2004 article, published in "Gases and Technology," demonstrated that GCI believed that W-seal products were being manufactured in the U.S. that were not manufactured by or for Fujikin. Doc. 80-5 at 36 (stating that "any product using this [W-seal] technology that is manufactured, assembled, sold, or used in the U.S. requires a license from GCI unless the W-seal hardware is purchased by or from Fujikin"). Moreover, Mr. McGarvey averred in his declaration that he had "specific knowledge that Bar Manufacturing, LLC of El Dorado Hills, California manufactured and sold W-seal component base blocks to

---

[15] Defendants argue that the following facts "prove that GCI knew it was prohibited from suing Mott and Setra" when it filed suit: (1) that GCI sent Fujikin a letter stating that it had sued a number of companies in the Eastern District of Virginia based on their use of Fujikin's W-seal designs, (2) that GCI sent a claim chart to Mott comparing the claims of the '464 patent to Fujikin's W-seal patents, (3) that publicly available evidence exists authored by GCI indicating that GCI believed that the term "W-seal" was synonymous with Fujikin's W-seal technology, and (4) that GCI's "knowledge and involvement in the industry" made GCI more than an "ordinary observer" who could claim a good faith error. Doc. 86 at 10-12.

[16] Defendants also make much of GCI's purported "written admission" in its Memorandum in Support of its Motion to Stay (Doc. 68) that "the arbitration proceeding will almost certainly be dispositive of the issues at bar in this case." Doc. 87 at 4 (citing Doc. 68 at 5) (emphasis in original). However, GCI's statement disclosed no information about GCI's knowledge at the time it filed suit. See doc. 68. Indeed, GCI specifically stated in its Memorandum in Support that it had premised its motion on the fact that "Setra and Mott have each alleged [in their answers to GCI's complaint] that their accused products were manufactured by or for Fujikin," and on the assumption that "the facts alleged in Setra's and Mott's answers [were] truthful and accurate." Id. at 3. Thus, at most, GCI's statements demonstrate that GCI realized after the commencement of its suit that the issues it had raised were better suited for arbitration, but such an after-the-fact realization says nothing about GCI's subjective knowledge at the time it filed suit.

Mott and Setra that were not licensed under GCI's '464 patent." Doc. 85-2 at ¶ 6. Finally, GCI did not agree to dismiss this case until after learning what percentage of Defendants' products was produced either by or for Fujikin on June 21, 2011. Doc. 87 at 11; see also doc. 85-8 at ¶¶ 8-9. This all suggests that until reviewing Defendants' Answers to its Complaint and inspecting Defendants' sales data, GCI had a subjective belief that Defendants' products were neither manufactured for, nor purchased from, Fujikin.

Defendants argue that "in light of its contractual obligations, any attempt by GCI to use ignorance of the relationship between Defendants' W-seal products and Fujikin's W-seal technology as an excuse must be rejected." Doc. 86 at 13. However, even assuming that GCI breached its obligations under Section 6.1 of the PLA,[17] such a breach does not appear to be of the kind that would allow for an inference of bad faith in a Section 285 motion to declare a case exceptional. See Phonometrics, 350 F.3d at 1246 (holding that where "the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence'") (quoting Eltech, 903 F.2d at 811).

The cases do not allow a plaintiff to escape a finding of subjective bad faith where he, in effect, should have known at the time of his filing that his claims were objectively baseless. See, e.g., Stephens, 393 F.3d at 1273-74 ("A frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known was baseless."). But, they do not suggest that bad faith should be imputed to a plaintiff, merely because he could have taken some action that might have resulted in him gaining the knowledge at issue. See Phonometrics, 350

---

[17] Section 6.1 only requires that either party "promptly" notify the other party if that party believes that the '464 patent is being infringed and does not define that term. See doc. 80-2 at § 6.1. Thus, it is unclear from the face of the document whether notice must be sent to Fujikin before GCI commences suit against the alleged third party infringers, and here GCI did send Fujikin a letter on April 1, 2011, informing Fujikin that it had recently commenced suit against a number of U.S. infringers in the Eastern District of Virginia. See doc. 80-12 at 1.

F.3d at 1246; Marctec, 664 F.3d at 919. Here, nothing in the record demonstrates that GCI necessarily would have learned that Defendants either purchased products from, or manufactured products for, Fujikin, if GCI had notified Fujikin of its belief that Defendants were infringing the '464 patent. Thus, GCI's alleged breach does not seem so unreasonable as to allow the Court to infer that GCI lacked good faith in bringing its claims. Accordingly, even if the Court had found that GCI's claims were objectively baseless when filed, the Court **FINDS** that Defendants have not met their burden of demonstrating by clear and convincing evidence that GCI's claims were filed in subjective bad faith.

### III. CONCLUSION

Given GCI's repeated and good faith attempts to dismiss this case, the lack of communication by both parties, and the relatively short period of time during which this case was litigated, the Court **FINDS** that no litigation misconduct occurred. Moreover, as neither the PLA nor any previous precedent actually foreclosed GCI from bringing its claims in federal court, the Court **FINDS** that GCI's claims were not objectively baseless when filed, and as Defendants have failed to demonstrate that GCI knew or should have known that its claims were baseless when filed, the Court **FINDS** that GCI's claims were not brought in subjective bad faith. Accordingly, for the reasons stated herein, the Court **DENIES** Defendants' Motion to Declare this Case Exceptional.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
_____
Henry Coke Morgan, Jr.
Senior United States District Judge

_____
*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
Date: May 31, 2012

28